1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS
 2

 3
       UNITED STATES OF AMERICA,        )
 4                                      )
                        Plaintiff,      )
 5                                      )
                vs.                     )  Case No. 1:04-CR-10084
 6                                      )  Peoria, Illinois
       DAVID G. OHLENDORF,              )
 7                                      )
                        Defendant.      )
 8

 9              TRANSCRIPT OF DETENTION HEARING
10                  FEBRUARY 10, 2005

11              BEFORE:
                THE HONORABLE JOHN A. GORMAN,
12                  Magistrate Judge

13                  APPEARANCES:

14              K. TATE CHAMBERS, ESQUIRE
                    United States Attorney
15              211 Fulton Street, Suite 400
                    Peoria, Illinois  61602
16              (Appeared on Behalf of the Plaintiff)

17              DENNIS M. SHEEHAN, ESQUIRE
                    408 Court Street

18              Pekin, Illinois  61554

19                      AND

20              MARK A. EISENBERG, ESQUIRE
                    Eisenberg Law Offices, S.C.
21              308 East Washington Avenue
                    Madison, Wisconsin  53701
22              (Appeared on Behalf of the Defendant)

23

24              Jennifer E. Johnson, CSR, RPR-RMR
       Proceedings recorded by mechanical stenography, transcript
25     produced by computer
```

1           THE COURT:  This is the United States versus

2    David Ohlendorf.  Please show the presence of Defendant,

3    show the appearances of Counsel.

4           Appearing for the United States, Assistant

5    United States Attorney Tate Chambers.  In this case,

6    Mr. Sheehan, who has previously been appointed by the

7    Court, is present.  Since that time, Attorney Mark

8    Eisenberg has entered his appearance -- written appearance

9    on behalf of the defendant.  Mr. Eisenberg is present in

10   court.

11          At this time, Mr. Ohlendorf, is it your

12   request that the Court allow Mr. Eisenberg to enter his

13   appearance on your behalf and act as your counsel?

14          DEFENDANT:  Yeah.  Yes.  Yes.

15          THE COURT:  Okay.  Is this agreeable, then,

16   that Mr. Sheehan be allowed to withdraw?

17          DEFENDANT:  Yes.

18          THE COURT:  Mr. Sheehan, you will be

19   withdrawn.

20          MR. SHEEHAN:  Thank you, Judge.

21          THE COURT:  Okay.  The Court will grant

22   Mr. Sheehan's motion to withdraw.  You can --

23          MR. SHEEHAN:  Thank you, Your Honor.

24          MR. EISENBERG:  I'm ready to go, Your Honor.

25          THE COURT:  Okay.  This matter is set at this

3

```
 1      time for a detention hearing.  This is a presumption case,

 2      gentlemen?

 3                  MR. CHAMBERS:  It is, Your Honor.

 4                  THE COURT:  You may proceed.

 5                  MR. CHAMBERS:  Thank you, Your Honor.  Your

 6      Honor, the government would ask the Court -- we would

 7      proffer the information contained in the Pretrial Services

 8      report, ask the Court to follow the recommendation of the

 9      Pretrial Services officer for detention, and ask the Court

10      to take judicial notice of the indictment in this matter.

11                  Thank you.

12                  THE COURT:  Mr. Eisenberg.

13                  MR. EISENBERG:  Your Honor, I have a witness

14      that I'd like to call first.  Actually, I have four

15      witnesses.  One I do want to put on; the other three I can

16      make proffers.  If you want me to put them on, I can do

17      it.  I can just tell you what they would say, so --

18                  THE COURT:  Mr. Chambers?

19                  MR. EISENBERG:  I don't know how much time --

20                  MR. CHAMBERS:  I'm not certain what they'd

21      say, but if it's family members and such as that --

22                  MR. EISENBERG:  Right.

23                  MR. CHAMBERS:  -- I wouldn't have any

24      objection to that, Your Honor.

25                  THE COURT:  You can just tell him and see if
```

4

1    he'll agree, and you tell me.

2            MR. EISENBERG:  Do you have -- his parents are

3    here, Glen and Carol Ohlendorf -- they are willing to act

4    as supervisors for Mr. Ohlendorf -- along with his

5    girlfriend, Sandy Schaefer; she lives with him.  They

6    would -- my proposal, Your Honor, would be that he be

7    under electronic monitoring and in the house 24 hours a

8    day, 7 days a week, with a supervisor.  One of those three

9    people will be with him at all times.  He also has -- and

10   they would testify that they would be willing to call

11   Pretrial Services on any violations that Mr. Ohlendorf

12   would commit, such as that -- the conditions that I'm

13   thinking about, Your Honor, house arrest, electronic

14   monitoring, 24/7 custody or supervisor, no contact with

15   any person by phone or in person with any Hell's Angel

16   member, report to Pretrial Services or local law

17   enforcement as required, and no alcohol or controlled

18   substance, obviously, in the house.

19           The family members are also -- the mother and

20   father are also willing to put up their house.  I see the

21   Pretrial Services report does not indicate that he's a

22   flight risk; this is a dangerousness issue.  But they are

23   willing to put up their house as a show of good faith;

24   that's how much they believe in their son, that he is not

25   going to commit any crimes while he's out on bail and that

1    he will appear for all court appearances.

2              I should note that Mr. Ohlendorf has never

3    missed a court appearance in any of his prior proceedings.

4              My understanding of the house is it's worth

5    approximately -- there's equity in that between 150 and

6    $250,000, but I told the U.S. attorney, I said that I

7    would get a report on file and get an appraisal done

8    within a week or two if you were inclined to let him out

9    under the conditions that I suggested, and, and -- so that

10   there was sufficient equity in the house of at least

11   150,000 and then give a mortgage to the clerk's office.

12   That's how I've done it in the past.

13             The -- seems to me the issue here, Your Honor,

14   is dangerousness, and that's what I'd like to call the

15   other witness to talk about.

16             THE COURT:  Come forward, please, and raise

17   your right hand, and she'll swear you in.

18                    (Witness sworn.)

19                       GARY BASS,

20   called as a witness, after being first duly sworn by the

21   Clerk of the Court, was examined and testified upon his

22   oath as follows:

23                  DIRECT EXAMINATION

24   BY MR. EISENBERG:

25        Q.   Would you state your name and spell your last

6

```
1      name for the record, please?

2             A.   My name is Gary Bass, B-a-s-s.

3             Q.   And do you know Dave Ohlendorf?

4             A.   Yes, I do.

5             Q.   How do you know him?

6             A.   I've known him for six years, a personal

7      friend of mine.

8             Q.   Are you a Hell's Angels motorcycle --

9             A.   No, I am not.

10            Q.   -- member?

11            A.   No, I am not.

12            Q.   How do you know him?  He's a personal friend?

13     Can you describe the types of things that you do with him?

14            A.   We have family affairs together.  My kids play

15     with his kids.  We work out at the gym together.  Pretty

16     much do everything together.

17            Q.   How old are your children?

18            A.   I have one that's 5 and one that's 13.

19            Q.   And how old are his children?

20            A.   He has one that's 8 and one that's 11.

21            Q.   Okay.  And what's the status -- the children

22     live with him, correct?

23            A.   Correct.

24            Q.   And the mother passed away?

25            A.   Mother passed away, and he takes care of the
```

1    children.

2            Q.    He's the sole custodian for those children?

3            A.    Correct.

4            Q.    He has been for the last, what, few years?

5            A.    Yes, two or three years.

6            Q.    There's an allegation that Mr. Ohlendorf is

7    dangerous in this matter.  Have you seen any indication

8    with him in the last six years that he has been dangerous?

9            A.    No, not at all.

10            Q.    Had you known -- had you had any information

11    that he would be dangerous, would you be associating with

12    him?

13            A.    No, I would not.

14            Q.    Describe him as a father.

15            A.    He's an excellent father.  He loves his kids.

16    He's a good person.  He's -- you know, I got hurt two

17    years ago; he took care of my business for me.  I own my

18    own business, car repair.  He's just done everything for

19    me.

20            Q.    Do you know anything about his work history?

21            A.    Yes, he's always worked.

22            Q.    What does he do?

23            A.    He's a truck driver.

24            Q.    And how do you know that he's always worked?

25            A.    Well, I've been around him for the last six

1    years, and in the last six years he's worked.  There's

2    times that, you know -- I mean, some of the work is

3    seasonal.

4                MR. EISENBERG:  Your Honor, at this time I

5    would -- who marks the exhibits?

6                THE COURT:  Well, you're supposed to, but

7    that's all right.  You can mark them.  Just get them

8    marked.

9                MR. EISENBERG:  At this time, Your Honor, I'm

10   putting in a Exhibit 1.  I don't think there are any

11   objections.

12               THE COURT:  Well, show it to him first.

13               MR. EISENBERG:  I have.  I already showed it

14   to him.

15               THE COURT:  All right.

16               MR. EISENBERG:  Which is a letter from

17   Mr. Ohlendorf's union president indicating that he's a

18   member in good standing in the union.  And Exhibit 2 is

19   his tax returns for 2003, indicating that he has a

20   legitimate source of income.

21   BY MR. EISENBERG:

22        Q.   What do you know about Mr. Ohlendorf's

23   finances?

24        A.   Well, he's just a working person like the rest

25   of us.  He has bills, he has credit cards, and he has --

```
1        just the same as all of us.

2               Q.   Is he -- would you -- what about his living

3        arrangements?  Where does he live?

4               A.   He lives in a home.  He lives in a home.

5               Q.   Do you know how he bought the home?

6               A.   The home was purchased by his father-in-law.

7               Q.   Okay.  Because he didn't have enough income to

8        do it?

9               A.   Right.  The income to do it, correct.

10              MR. EISENBERG:  Okay.  I don't have anything

11       else, Your Honor.

12              MR. CHAMBERS:  May I, Your Honor?

13              THE COURT:  Yes, Mr. Chambers, you may

14       inquire.

15                              CROSS-EXAMINATION

16       BY MR. CHAMBERS:

17              Q.   Sir, let me catch your last name again.

18              A.   Bass, B-a-s-s.

19              Q.   And the nature of your relationship with the

20       defendant?

21              A.   Friend.  Friend.

22              Q.   And, Mr. Bass, do you know him as a good

23       father?

24              A.   Yes, I do.

25              Q.   And a good friend of yours?
```

1        A.   Correct.

2        Q.   And a good son to his mom -- to his mom and

3   dad?

4        A.   Correct.

5        Q.   Do you agree with me that maybe there could be

6   another side to Mr. Ohlendorf?

7        A.   I've never seen it.

8        Q.   Do you agree that there could be?

9        A.   I suppose there could be, yes.  I don't know.

10       Q.   Are you familiar with the organization he

11   belongs to, the Hell's Angels?

12       A.   Yes, I am.

13       Q.   And how are you familiar with them?

14       A.   Just because he's a member of them.

15       Q.   Have you ever attended any of their

16   fund-raisers?

17       A.   Yes, I have.

18       Q.   Been over to the clubhouse?

19       A.   Yes, I have.

20       Q.   How many times have you been to the clubhouse?

21       A.   I don't know how many times.  Numerous times.

22       Q.   In agreeing with me that maybe there's a side

23   you don't know, am I correct in assuming that in June

24   of 1994 you were not present when the defendant and

25   another Hell's Angel shot the president of the Outlaw

1      Motorcycle group?

2               MR. EISENBERG:  Well, Your Honor, I think this

3      is stating a fact that's not in evidence.  And I don't

4      know how we're ever going to get through the indictment

5      because the government is going to argue -- excuse me, the

6      government's going to argue that there's all this strong

7      evidence against him, and he's not going to put any

8      evidence in; and I'm going to argue that the evidence is

9      weak.  And we're going to get into who's telling the truth

10     here about the strength of the case.  And I think if

11     that's what he's trying to do, he said he didn't know him

12     in 1994.  We're talking about dangerous now.  We're not

13     talking about dangerous 20 years ago.

14               THE COURT:  I think he can try and inquire as

15     best he can about what he knows about him, but I do think

16     we can't go through the indictment.

17               MR. CHAMBERS:  Well, I will, Your Honor.  Then

18     I'll bring it current.

19     BY MR. CHAMBERS:

20          Q.   Were you part of any conversations when you

21     were there at the Hell's Angel clubhouse where he directed

22     members to come to Peoria to kill members of the Outlaw

23     gang?

24          A.   No, I was not.

25          Q.   You didn't hear those conversations?

1       A.    No, I didn't.

2       Q.    If they occurred?

3       A.    Right.  If they occurred, correct.

4       Q.    Were you present at any conversations when you

5    were there at the Hell's Angel clubhouse where he directed

6    and agreed, if he did, with other individuals to hunt down

7    Outlaws at the Route 66 Speedway and murder them there?

8       A.    No, I was not.

9       Q.    Not aware of any of those, if they occurred?

10       A.    No.  No.

11       Q.    Well, let me ask you about this one because I

12    think actually this one resulted in a conviction.  Were

13    you aware of the time that he and a couple other members

14    kidnapped a gentleman, took him inside the house, wrapped

15    him in a carpet, stuck a gun in his mouth and pulled the

16    trigger?  Were you aware of that situation?

17       A.    I was aware of it, but I was not a friend of

18    his at that time -- at that particular time.

19       Q.    You're aware of it because he was convicted of

20    it, correct?

21       A.    Correct.

22             MR. EISENBERG:  Judge, I don't think that's

23    accurate.  I think he was convicted of what he was

24    convicted with on his record, not attempted murder,

25    et cetera, et cetera, and not kidnapping.

1                    THE COURT:  The Court has the defendant's

2      record.

3                    MR. CHAMBERS:  Those are my questions.  Thank

4      you, Your Honor.

5                    MR. EISENBERG:  Could I just ask one more?

6                    THE COURT:  Yes, you may.

7                         REDIRECT EXAMINATION

8      BY MR. EISENBERG:

9           Q.   What's his position about controlled

10     substances?

11          A.   He's totally against it.

12          Q.   Have you ever seen him use any controlled

13     substances?

14          A.   No, I haven't.

15          Q.   Be around any controlled substances?

16          A.   No, I haven't.

17          Q.   Have anything to do with controlled

18     substances?

19          A.   No.

20                   MR. EISENBERG:  That's all I have.

21                   MR. CHAMBERS:  Nothing further.  Thank you,

22     Your Honor.

23                   THE COURT:  He can step down.

24                   MR. EISENBERG:  I only have argument now, Your

25     Honor.

14

1                    THE COURT:  Okay.  Anything -- any other

2      evidence?

3                    MR. CHAMBERS:  No.  No evidence, Your Honor.

4      Thank you.

5                    THE COURT:  Okay.  You gentlemen can make

6      argument.

7                    MR. EISENBERG:  Me first?

8                    THE COURT:  Yes, you.

9                    MR. EISENBERG:  Your Honor, I've already

10     talked about what I think the conditions are that would

11     assure safety of the community and would assure his

12     appearance.

13                   I should point out that the government's going

14     to argue he's dangerous, he's dangerous, and the

15     government is going to use the indictment and the

16     allegations -- and that's what they are, allegations -- in

17     the indictment to say he's dangerous.  They're also going

18     to try to use his prior criminal record which is -- the

19     last conviction he had, the last trouble he's been in was

20     1997, eight or nine years ago, when he was present for an

21     aggravated battery.  He did his time, he got out in 2001,

22     and has had no trouble ever since, unless you believe all

23     the allegations in the indictment, and I don't know how

24     you can make that determination.  That's what the trial's

25     for.

1          The -- you know, there was a good case I found

2     on, on this issue, and it's United States versus Hammond,

3     and it's out of the Eastern District of Wisconsin.  And in

4     it, Judge Adelman was talking about this detention rule

5     when somebody's dangerous, and this happened to deal --

6     this case happened to deal with an Outlaw Motorcycle

7     member who had been in jail for a year and asked to have

8     his detention hearing reviewed.

9          And the Court said that it's -- Only in rare

10    circumstances should release be denied, and doubts

11    regarding the propriety of release should be resolved in

12    favor of release.  It went on to talk about the burden of

13    production and rebutting the presumption.  And it said

14    that, "The burden of production is not a heavy one to

15    meet.  Any evidence favorable to a defendant that comes

16    within a category less than 3142(g) can suffice."

17         And then the government, after I come forth

18    with the burden of production -- which I think I have,

19    Judge; I put the witness on -- I think the government has

20    to rebut that by clear and convincing evidence that no

21    condition of release or conditions will protect the

22    community because I don't think we're really even talking

23    about him being a flight risk.  But even so, I'm willing

24    to put up the house for that factor.

25         And in this particular case, the Court says

1    you can't just rely on the indictment, and that's all the

2    government's doing.  You have to look at other factors:

3    The weight of the evidence; they don't put on anything

4    about how strong their case is.  The history of the

5    person; he's a lifelong resident of Illinois.  He's got

6    two children who he's the sole custodian for, ages 8 and

7    11.  He's had strong employment since he's been out of

8    prison.  He has some financial resources, but he isn't

9    certainly rolling in it.  For someone who sold 20 kilos of

10   methamphetamine and cocaine, I want to see where the money

11   is.  Maybe he's hiding it in a shoe box in the clubhouse.

12   Debt with credit cards, with mortgages.  He can't even get

13   a mortgage because -- he's got to have his father-in-law

14   get the house for him because he doesn't have financial

15   resources to do so, but he's this big 20 kilo

16   methamphetamine and cocaine drug dealer.

17           I grant you that the only issue really is his

18   criminal history in this case.  It's old.  He's done his

19   time for that.  I haven't seen any weapons violations or

20   any parole violations.  He completed his parole from 2000,

21   2001.  He's been a hard worker ever since.

22           This is the kind of case, Judge, I believe

23   that the government just wants you to look at the

24   indictment and say, This guy is a bad guy; he's a Hell's

25   Angel; he's dangerous; put him away.  They haven't given

1       you any reason other than the allegations to do that.

2              I think we've talked about a number of

3       conditions that would assure the safety of the community.

4       I'm willing to provide Pretrial Services with his monthly

5       phone call bills from any cell phones or any regular line

6       phones that they have so they can track, make sure he's

7       not having any contact with members.

8              We'll agree that no adult other than the three

9       people that I've mentioned -- his mother, his father and

10      Sandy Schaefer -- would come to the house.  I don't know

11      what else we can do.  Electronic monitoring and no leaving

12      -- no leaving the house whatsoever.  I think that would

13      assure the safety of the community, and I'd ask you to do

14      that and grant him the bail.

15             Thank you.

16             MR. CHAMBERS:  May I?

17             THE COURT:  Mr. Chambers.

18             MR. CHAMBERS:  Your Honor, I'd like to begin

19      by telling the Court that the government is not arguing

20      that the defendant is a bad father, is a bad son, is a bad

21      friend.  The government's not arguing that.  I'm certain

22      that his mother and father would testify -- and as his

23      friend testified -- he's all of those things, he's a good

24      father, he's a good son, and he's a good friend.  But he's

25      also a very dangerous member of a very dangerous

1    organization.

2              Counsel asked the Court to walk through the

3    factors.  To get to the factors if the presumption has

4    been rebutted -- and we would submit to the Court the

5    presumption hasn't been rebutted -- I'm certain that his

6    mom and dad are very well-meaning when they offered to put

7    up their home.  That's a huge step to take, a life of work

8    to build up that much equity in a home.  And to place it

9    on their son on bond, that's a huge step to take; and it

10   shows how much they actually love -- they love their son.

11   But I would submit to the Court that a gentleman with this

12   background and at this age cannot be controlled by his mom

13   and dad, and he's past that.

14             The presumption, we would submit to the Court,

15   has not been rebutted.  With all due respect to the

16   District Court in Wisconsin, Congress has said that when

17   you have this type of defendant, there is a presumption --

18   rebuttal, yes -- but a presumption that he should be held,

19   that he's dangerous, and that he's a risk of flight.

20             If you look at the factors Counsel asked you

21   -- skip the first one.  The first one was the nature and

22   circumstances of the offense charged, including whether

23   the offense is a crime of violence; it is.  Attempt after

24   attempt after attempt of murder, beating, arson.  And

25   whether or not it involves a narcotic drug; it does,

1    cocaine and methamphetamine.  That's the very first factor

2    Congress tells us to look at, and he hits on both of

3    those.

4            The weight of the evidence.  Counsel says we

5    have no evidence.  Well, I would submit to the Court that

6    a grand jury disagreed and at least found probable cause

7    to have this indictment indict the defendant and three of

8    his cohorts in the Hell's Angels racketeering conspiracy.

9            Counsel admits he's got a rather spotty

10   criminal history, and I would suggest that he does -- a

11   prior felony drug conviction and an ag bat.  The Court

12   heard a few of the facts of that, where they stuck the gun

13   in the gentleman's mouth and pulled the trigger.

14           When you add all that together, Your Honor, we

15   submit that no matter how well-meaning his friend is or

16   his mother and his father, that the presumption has not

17   been rebutted; and that even if it has been rebutted, that

18   it's still the consideration of this Court, and under the

19   factors under 3142(g), the defendant should still be

20   detained pending trial.

21           THE COURT:  Okay.  All right.  The Court has

22   considered the Pretrial Services report, the information

23   presented at the hearing.  The Court's familiar with the

24   statute.  The Court does not believe the presumption has

25   been rebutted, and the defendant will be detained.  The

1     Court finds the defendant is a danger.

2                    Anything further at this time, Mr. Chambers?

3                    MR. CHAMBERS:  Nothing from the government,

4     Your Honor.

5                    THE COURT:  Anything further, Mr. Eisenberg?

6                    MR. EISENBERG:  Yes, sir.

7                    THE COURT:  Anything further at this time?

8                    MR. EISENBERG:  No, Your Honor.  Thank you.

9                    THE COURT:  Mr. Eisenberg, you weren't here,

10    but I will review with you that these matters have been

11    previously set.

12                   MR. EISENBERG:  We need to talk about that

13    because --

14                   THE COURT:  Well, you'd have to bring that --

15    if you do have problems with the setting -- I'm just going

16    to tell you that the cases are set.  And, let's see here,

17    this matter is set for a pretrial conference on March the

18    18th, '05, at 3:30 and for a jury trial March 28th at 8:30

19    before Judge Mihm in Courtroom A.

20                   MR. EISENBERG:  Obviously, Your Honor, from

21    what I've understood after talking to Mr. Chambers is that

22    there are voluminous discovery in this matter, two rooms

23    full or boxes full of -- two rooms of boxes or something

24    along those lines, and this is going to be a complex case

25    that isn't going to be resolved in that time.  And I

1       thought I'd bring it to the Court's attention now because

2       we haven't even worked out how we're going to -- the

3       logistics of getting the materials to me.

4                   THE COURT:  I think what's going to have to be

5       done is you're going to have to do that, and then you're

6       going to have to file the appropriate motion in front of

7       Judge Mihm who controls his calendar; I don't.

8                   MR. EISENBERG:  Okay.

9                   THE COURT:  Okay.  You understand?

10                  MR. EISENBERG:  Yes, sir.

11                  THE COURT:  Okay.

12                  MR. EISENBERG:  Is there a court reporter in

13      here, or is there a tape recorder?

14                  THE COURT:  We've got it down on tape.

15                  MR. EISENBERG:  So I order a transcript

16      through you?

17                  THE COURT:  You can tell the clerk to order a

18      transcript, and you get a transcript that way.

19                  MR. EISENBERG:  Yes, I do.

20                  THE COURT:  Okay?

21                  MR. EISENBERG:  Thank you.

22                  (Proceedings concluded.)

23

24

25

```
 1     STATE OF ILLINOIS  :
                           :  SS
 2     COUNTY OF PEORIA    :

 3

 4
               I, JENNIFER E. JOHNSON, CSR, RMR, CRR, and
 5     Notary Public in and for the County of Tazewell, State of
       Illinois, do hereby certify that the foregoing transcript
 6     of proceedings is true and correct to the best of my
       knowledge and belief;
 7
               That I am not related to any of the parties
 8     hereto by blood or marriage, nor shall I benefit by the
       outcome of this matter financially or otherwise.
 9

10

11

12

13                           _____
                             JENNIFER E. JOHNSON
14                           License #084-003039
                             CSR, RMR, CRR
15                           Notary Public, State of
                             Illinois at Large
16

17            My Commission expires May 8, 2005.

18

19

20

21

22

23

24

25
```